1    PATRICIA J. BARRY (State Bar No.59116)
      634 S. Spring St., Ste 823
2    Los Angeles, Ca 90014
      Tele. (213) 995-0734
3    Fax   (213) 995-0735
      pbarrylegal@gmail.com
4    Attorney for Plaintiff ELIZABETH CHAVIRA
      on behalf of herself and her minor daughters,
5    C.R. and M.R. as their Guardian ad Litem

6

7

8                UNITED STATES DISTRICT COURT

9             CENTRAL DISTRICT OF CALIFORNIA

10

11   ELIZABETH CHAVIRA,       )   CASE NO. SA CV 13-0890 JVS
     on behalf of herself and her minor )
12   daughters, C. R. And M.R. as their )   SECOND AMENDED AND
     Guardian ad Litem,          )   SUPPLEMENTAL COMPLAINT FOR
13                           )   DAMAGES AND INJUNCTIVE RELIEF;
         Plaintiff,             )   ATTORNEY FEES AND COSTS,
14                           )   VIOLATION OF FEDERAL CIVIL
         v.                   )   RIGHTS AND STATE TORTS
15                           )
     DEBBIE GALLEGOS (individual )   1. 42 U.S.C. Sec. 1983 - Denial of Equal
16   capacity), JOSEPH            )        Protection and Due Process,
     HERNANDEZ, (individual      )        Fourteenth Amendment;
17   capacity) A.RAMIREZ,(individual )
     capacity) JOSE RAMIREZ,     )   2. 42 U.S.C. Sec. 1983 - *Monell* violation;
18   (individual capacity), COUNTY   )
     OF LOS ANGELES; DOES 1 -   )   3. Failure to Carry Out Mandatory Duty
19   10, inclusive,              )        (Negligence per se);
                          )
20          Defendants.          )   4. gender violence (C.C. Sec. 52.4);
                          )
21  ——————————————— )   5. Domestic violence

22                                 6. False Imprisonment

23                                 7. Intentional Infliction of Emotional
24                                     Distress

25                                 8. Injunctive Relief

26                           DEMAND FOR JURY TRIAL

27       PLAINTIFF ELIZABETH CHAVIRA on behalf of herself and her minor

28   daughters, C.R. and M. R. as their Guardian ad Litem for her Second Amended

     Complaint alleges as follows:

## INTRODUCTION

1.     This is an action for damages to redress the denial of Plaintiff's and her two daughters' federal civil rights based on violation of the Due Process Clause and the Equal Protection Clause, witness intimidation, and related state torts.  Repeatedly, the courts and law enforcement give breaks to law enforcement officers when they engage in domestic violence and repeatedly the officers continue to engage in violence against women and children.  DEFENDANT ANTONIO RAMIREZ ("A. Ramirez") is one such individual.  He is employed by the Los Angeles County Sheriff's Department notorious for its violent and corrupt jails and the violence (and racism) of the deputy sheriffs on the streets of Los Angeles County.

2.     A. Ramirez has engaged in a pattern of domestic violence since 2003 against PLAINTIFF ELIZABETH CHAVIRA ("Chavira"), the mother of their two daughters, C. R., now age 11 (DOB September 4, 2002) and M. R., now age 7 (DOB October 17, 2006).  They separated several times and each time Chavira moved back in with him, he resumed his pattern of heavy drinking, screaming, and battering of Chavira.  The children often witnessed the violence.  The violence witnessed by C.R. has caused her grave mental and emotional injuries, affecting her schooling.

3.     The Sheriff's Department and other police departments have engaged in a pattern of denial of equal police services and repeated failures to carry out their mandated duties they owe to victims of domestic violence with respect to Chavira.

4.     For example, DEFENDANT DEBBIE GALLEGOS, ("Gallegos") Los Angeles Deputy Sheriff, owes a duty to Chavira to determine who the dominant and primary aggressor was when she made a domestic violence call to the home of Chavira and A. Ramirez.   Instead, she accepted the word of A. Ramirez that it was Chavira who had started the altercation when it was he who was the aggressor.

1  Rather than to order A. Ramirez from the home, Gallegos forced Chavira out of
2  the home, making her and her two children homeless, and threatened her to take
3  punitive action against her if Chavira did not leave immediately.  A. Ramirez
4  remains in the home purchased and paid for, by both A. Ramirez and Chavira.

5       5.     Gallegos and the other defendants engaged in the same discriminatory
6  treatment against Chavira as a woman and a victim of domestic violence.  As a
7  direct result of their failure to carry out their mandatory duties, Chavira and her
8  two daughters have suffered damages.

9  **JURISDICTION AND VENUE**

10       6.     The Court has jurisdiction over this action pursuant to,  28 U. S.C.
11  Sec.1331 (federal question), and under 28 U.S.C. Sec.1367(a) (supplemental
12  jurisdiction based on the same core of facts on which the federal claims are based).
13  Venue lies in this district since the claims arose and the defendants are located in
14  the Central District of California.

15  **PARTIES**

16       7.     Chavira is a former resident of Los Angeles County.  She is the
17  mother of C.R. and M.R.  She has sole legal and physical custody of the two
18  daughters.  She is the victim of A. Ramirez's violence and of the failure to protect
19  and to carry out their mandatory duties of the other defendants.  A. Ramirez and
20  the other defendants engaged in concerted action to insure that A. Ramirez would
21  not be arrested and convicted of domestic violence.

22       8.     C.R. is the minor daughter of Chavira and A. Ramirez.  She is now 11
23  years old.    She is the victim of A. Ramirez's violence because she repeatedly
24  witnessed her father's abuse of her mother  and of the failure to protect and to
25  carry out their mandatory duties of the other defendants.  A. Ramirez also engaged
26  in witness intimidation of C.R. with an intent to keep her from testifying about the
27  abuse she saw her father inflict on her mother in violation of the equal protection
28  rights of C.R. and her mother who are females and victims of his domestic

1 violence. A. Ramirez and the other defendants engaged in concerted action to
2 insure that A. Ramirez would not be arrested and convicted of domestic violence.

3      9.     M.R. is the minor daughter of Chavira and A. Ramirez. She is now 7
4 years old. She is the victim of A. Ramirez's violence because she repeatedly
5 witnessed her father's abuse of her mother and of the failure to protect and to
6 carry out their mandatory duties of the other defendants. A. Ramirez and the other
7 defendants engaged in concerted action to insure that A. Ramirez would not be
8 arrested and convicted of domestic violence.

9      10.    Gallegos is employed by the Los Angeles County Sheriff's
10 Department. She caused the injuries of which Plaintiffs complain. She is sued in
11 her individual capacity.

12      11.    DEFENDANT JOSEPH HERNANDEZ ("Hernandez") is employed
13 by the Los Angeles County Sheriff's Department. He caused the injuries of
14 which Plaintiffs complain. He is sued in his individual capacity.

15      12.    A. Ramirez is employed by the Los Angeles County Sheriff's
16 Department. He caused the injuries of which Plaintiffs complain. He is sued in
17 his individual capacity.

18      13.    DEFENDANT JOSE RAMIREZ ("J. Ramirez") is employed by the
19 Los Angeles County Sheriff's Department. He caused the injuries of which
20 Plaintiffs complain. He is sued in his individual capacity.

21      14.    DEFENDANT COUNTY OF LOS ANGELES ("County") a public
22 entity existing by reason of the constitution and laws of the State of California. Its
23 policies, customs, practices, and procedures caused the constitutional violations of
24 which Mother and Children complain. Under the California Government Claim
25 Act, the County is responsible under the respondeat superior doctrine.

26      15.    Defendants DOE 1 through DOE 10, inclusive, are sued herein under
27 fictitious names. Their true names and capacities are unknown to Chavira. When
28 their true names and capacities are ascertained, Chavira will amend this complaint

1   by inserting their true names and capacities herein. Chavira is informed and
2   believes and thereupon alleges that each of the fictitiously-named defendants is
3   responsible in some manner for the occurrences herein alleged, and that Chavira's
4   damages as herein alleged were proximately caused by those defendants.

5         16.     Chavira is informed and believes and thereupon alleges that at all
6   times herein mentioned each of the defendants was the agent and employee of
7   each of the remaining defendants, and in doing the things herein alleged, was
8   acting within the scope of his/her agency and employment with the District.

9                         **STATEMENT OF FACTS**

10         17.     A. Ramirez is a violent individual with a history of extreme physical
11   and emotional abuse against Chavira. In August 2003, when C. R.'s baptism was
12   planned, A. Ramirez, who was drunk and angry, threw Elizabeth from wall to
13   wall. She was bleeding, her lip was broken, and had bruises on her back. The
14   baptism had to be cancelled because the bruises were too visible. Elizabeth did not
15   report this incident  but moved away from A. Ramirez for more than two years.

16         18.     In 2006, believing A. Ramirez had changed, Elizabeth reunified with
17   him. In December 2006, A. Ramirez hit Elizabeth on the head while she was
18   holding three-month-old M. R. The next day, with C. R. watching, A. Ramirez hit
19   Elizabeth on her face and threw her down a hallway. Elizabeth did not report this
20   incident because she did not want A. Ramirez to lose his job.

21         19.     In March 2007, after an argument, Elizabeth threw A. Ramirez's
22   clothes in the back yard; when he returned from work he threw a pan of hot oil at
23   her. With C. R. and M. R. present, A. Ramirez threw Elizabeth to the ground, hit
24   her several times, spit in her face, and choked her.

25         20.     After breaking Elizabeth's cell phone and taking all of the house
26   phones from her, Chavira attempted to seek help from her neighbors as she was
27   holding 5 month old M. Ramirez in her arms. A. Ramirez told her to take the baby
28   inside and not to notify the neighbors. A. Ramirez called LASD along with his

1    brother J. Ramirez.  A unit responded and J. Ramirez showed up, but neither

2    checked on Chavira's welfare or the children's well being

3         21.    In September 2008, after attending a wedding together, A. Ramirez

4    became angry, picked Elizabeth up and threw her across the room. The next day,

5    A. Ramirez attempted to apologize; they continued to live together but did not

6    speak for two months. In July or September 2008, in C. R.'s presence, A. Ramirez

7    threw Elizabeth across the room and spat in her face.  C. R. told a teacher her

8    father hits her mother.

9         22.    In September 2008, with the children, Elizabeth left A. Ramirez to

10   live at her mother's home. Five months later, Elizabeth, who had been evicted from

11   her mother's rental home, returned to live with A. Ramirez, and put C. R. in

12   counseling.  Chavira returned to the home because she owned it with A. Ramirez

13   and needed a place to stay.  She did not reunite with A. Ramirez and they slept in

14   separate rooms.

15        23.    In March 2009, in the children's presence, A. Ramirez punched walls

16   in their home, and told Elizabeth he wished she were dead and never existed.

17   Elizabeth obtained a temporary restraining order and filed a complaint with the

18   LASD, stating she had not reported prior incidents at A. Ramirez's request.   She

19   declined to prosecute because she did not want A. Ramirez to lose his job; the

20   temporary restraining order was dismissed.

21        24.    In June 2009 a family court issued A. Ramirez a stay away order and

22   move out order.  The Court ordered Chavira Property control to reside in their

23   jointly-owned home with the children.  The Court awarded temporary visitation to

24   A. Ramirez.  In January 2011 Elizabeth reunited with A. Ramirez and allowed him

25   to move back to their home after he said he was sorry and had changed.

26        25.    In January 2012, A. Ramirez  threw Chavira and pushed her to the

27   ground, in their bedroom.  C.R. witnessed her mother on the floor after hearing her

28   cry in pain in the bedroom and her father standing right behind her.  C.R. helped

1  her up.

2    26.    In February 2012 A. Ramirez threw a hard covered album book at

3  Chavira's face, as he was angry and Chavira walked away from him after arguing

4  and wanted to get away from him. The children witnessed their father hit their

5  mother with a book and began crying and screaming.  Being hit with the book left

6  a reddish bruising on right eye and cheek.

7    27.    In March 2012 at a birthday party for a friend, A. Ramirez became

8  extremely drunk at the event.  He would not allow Chavira to drive and later drove

9  home speeding recklessly drunk sometime between 3 and 4 AM on March 11,

10 2012.  Chavira begged him to stop and would not, and he threatened to crash to

11 kill them both.

12    28.    Chavira phoned Hernandez who was A. Ramirez's friend from work,

13 to please help.  Hernandez took no steps to arrest A. Ramirez for drunk driving

14 except to call A. Ramirez while he was driving, but A. Ramirez would not pick up

15 or answer his calls.  A. Ramirez  continued to verbally abuse Chavira, and yell

16 words of hatred as he engaged in drunk, reckless, out-of-control driving.

17    29.    A. Ramirez threw Chavira out of his truck to the ground and refused

18 to let her stay in "his truck" and locked her out of their home. She was locked out

19 of the home because her keys were in the house.   After almost 2 hours and

20 freezing outside hunched over next to the truck for heat, Chavira kept trying to

21 contact Hernandez.  Hernandez did nothing.

22    30.    Just before 6 am, A. Ramirez came out angry and upset that Chavira

23 called his friend and that Chavira had a big mouth, then kicked Chavira in her

24 back as Chavira was hunched down, then pulled her by her arm and hair as

25 Chavira refused to go in with his aggressive violent behavior.  As he forced her

26 into the home, he stated "You called Joe to let you in right and you're not going to

27 get me in trouble by having a neighbor see you out here crying".  Chavira quickly

28 ran into her daughter's room and closed the door, as Chavira was in pain.

1 Hernandez never showed up at the house nor did he arrest his good buddy  A.
2 Ramirez for domestic violence crimes or at least report him to their commander or
3 supervisor.

4      31.    On March 11, 2012, at approximately 11:44 am A. Ramirez received
5 a call from his sister Sandra Ramirez who was taking care of both  daughters for
6 the event they attended the previous night. Chavira could hear him yelling at her
7 daughter as to what happened and that's what she gets because does not behave.
8 He stormed out of the house upset that he was awaken and forced to pick up his
9 injured daughter.  His sister lives in Whittier which is five minutes away from a
10 hospital.

11      32.    Rather than take C.R. to the hospital five minutes away from his
12 sister's house, A. Ramirez drove C.R. back home to tell Chavira, "Get your ass up
13 you need to take your daughter to the hospital she broke her arm".  When C.R.
14 arrived with her father about 12:30 pm she was crying in extreme pain. A. Ramirez
15 continued to yell at her to shut up and that's what you get for not listening to her
16 sister".  Chavira was in pain herself  but Chavira quickly got up, showered after
17 seeing her daughter's arm hanging.

18      33.    Chavira drove C.R. to Bright Medical Urgent Care about 1:30pm.
19 After being at urgent care for two  hours, the medical personnel immediately sent
20 Chavira and her daughter to the ER at Whittier Presbyterian hospital, because C.R.
21 broke her left humerus in half and needed to be under narcotics because of the
22 excruciating pain she was experiencing.  A. Ramirez never came to the hospital.

23      34.    On March 15, 2012 , A. Ramirez verbally abused Chavira as Chavira
24 cared for C.R..  C.R. did not want to be cared for by A. Ramirez because of his
25 extreme verbal abuse when she broke her arm.  He continued to be verbally
26 abusive to Chavira and caused the girls to run in fear to their room.  Chavira called
27 Hernandez for help.

28      35.    On April 2[, 2013,] after a heated argument with A. Ramirez, Chavira

1   phoned Tina Hernandez, approximately at 10:13am.  Tina sent her husband to
2   intercede before A. Ramirez became physically abusive.  Hernandez arrived on or
3   about 11:30 pm.  While Hernandez was present, Chavira disclosed to him all the
4   history of abuse Chavira sustained from A. Ramirez, past and present.  Hernandez
5   had a talk with A. Ramirez and advised both of them to stay away from each other
6   and apart until Chavira could figure out how to separate for good.  However,
7   Hernandez made no arrest nor on information and belief, did he report to his
8   supervisors that A. Ramirez was engaging in a pattern of domestic violence and
9   terrorizing Mother and their Daughters alike.

10        36.     Although Chavira had purchased the home together with A. Ramirez,
11   A. Ramirez  controlled the living situation.  He moved her dresser into the family
12   room and kicked her out of their bedroom and threw her clothes out the closet.
13   Chavira did everything to avoid A. Ramirez.

14        37.     The following week A. Ramirez accused her of keeping the kids
15   from him and not allowing him to interact with them.  So, that week the following
16   routine stayed the same in the mornings and when Chavira picked the girls up
17   from school, then Chavira would drop them off with their father to avoid any
18   problems and Chavira would come home later in the evening.

19        38.     On April 29, 2012, Chavira was trying to head out as soon as Chavira
20   could before A Ramirez woke up.  The kids were showered, fed, and dressed to go
21   to 12 pm church.   Chavira made a pot of coffee and set her Mexican sandwich
22   with beans, cheese and eggs in the toaster oven, while Chavira went to change and
23   leave.

24        39.     A. Ramirez began to yell, scream, and call Chavira names.  He
25   dumped the coffee pot in the sink and the coffee grounds in the trash.  He then
26   grabbed Chavira and twisted her wrist and threw her Mexican sandwich into the
27   trash.

28        40.     Chavira told A. Ramirez she was calling the cops, and he said, "Go

1  ahead, they will not believe you, and you will be the one arrested, you'll see." A.

2  Ramirez immediately called his station to speak with Gallegos.

3      41.    Chavira called Officer J. Chavez who had issued the Emergency

4  Protective Order on March 31, 2009 against A. Ramirez while he worked in Pico

5  Rivera Station.  In late 2011 Chavez was transferred to City of Industry.  Chavira

6  called Chavez for help  hoping he would believe her and send a unit.  Lt. Chavez

7  answered, Chavira identified herself and told him about A. Ramirez who he would

8  know well since he worked with him for about 6 years. Chavira described what

9  had happened and to please help and to send someone.  As A. Ramirez heard her

10  phone call he began to chase her to take the phone away from her, and Chavira

11  told Lt. Chavez please send someone on her behalf – he is trying to take the phone

12  from her.

13      42.    Gallegos arrived alone instead.  Before Gallegos arrived, A. Ramirez

14  told the daughters that he was going to have their mother arrested and the children

15  started frantically crying in fear.  A. Ramirez greeted Gallegos out front, and then

16  entered through the side gate into the back patio.  She talked to him first, and then

17  asked to speak to Chavira after. Chavira refused at first, stating, "You are here for

18  him and going to side with him and I will just wait for City of Industry instead."

19  Gallegos assured her that she was a neutral and fair and going to hear both sides.

20      43.    Chavira began to tell her all that A. Ramirez did and disclosed the

21  most recent incident of March 10 and 11 and the history of abuse.  She

22  immediately became defensive stating, "Some of what you said A. Ramirez

23  relayed about the coffee and his behavior.  He stated that you hit him in the face

24  with the sandwich, and that's battery.  So if you're going to proceed in filing

25  charges with City of Industry station, **you both will go to jail** and your kids will

26  be taken and picked up from DCFS.  Is that what you want?  Because that is what

27  is going to happen, if you go forward."

28

44.     Chavira told her several times, that is not what happened, ask her kids they watched the whole thing,  A. Ramirez is lying. Chavira begged her to take a report from the kids, because she was siding with A. Ramirez and Sgt. Gallegos refused.  She then said, "**Stop acting like the victim, if you supposedly endured all this abuse, why would you subject yourself to the abuse and still live here? You need to leave and diffuse the situation and go to your mother's for a few days**".

45.     Chavira told Gallegos that she could not believe what she said because her mother died five months ago and that she was definitely protecting A. Ramirez. This is her home and he needs to leave. "I live here and have my things here along with my son's."  Gallegos responded, "**A. Ramirez says you're not on the title anymore so you don't have rights to the house and you live in the back room now, I suggest you make this easy and stop being the victim and move out."**

46.     Chavira could not believe what she had heard.   She told Gallegos, "This is not fair, I live here and this is my house and I'm on the loan on this home and liable". Chavira asked Gallegos again to please take a statement from her girls and she refused.

47.     Chavira told her that she had no place to go or money to move out. "**Honey, life is not fair but you need to move out and get back on your feet. I am going to order A. Ramirez to pay for the uhaul and a place to move into tomorrow, so I want you to pack your things today.  I am going to order A. Ramirez not to speak to you or use profanity and that goes for the both of you, and if I get a call back I will send a unit to arrest the both of you."**

48.     Gallegos asked A. Ramirez to come out and said to him, "**Do you understand, you are not to speak to her and start anything?"**  He said yes. "**Do you understand, I don't want you to speak to A. Ramirez and you need to pack**".  Chavira said yes. "**Now, who can help you pack or mediate while you**

1  do this to make sure there are no problems, how about Joe? You feel

2  comfortable with him and he knows all that is going on."

3       49.    Chavira agreed, as Chavira was not getting anywhere with Gallegos

4  and received no help from her because A. Ramirez was right again, the cops

5  won't believe her, and it was his word against hers, and it was just like in 2009

6  while going through court the first time.

7       50.    Gallegos left after being there approximately 30 minutes. Gallegos

8  never asked for her information, did not take a report, nor provide Chavira any

9  information about her rights as a domestic violence victim.  She failed, like

10  Hernandez and Chavez, to inform Chavira that she could make a citizen's arrest.

11  She failed to inquire of who the dominant or primary aggressor was and instead

12  chose to believe her good buddy and fellow colleague, a deputy sheriff, in place of

13  the mother.  She also refused to speak with the children although they were

14  victims as well.

15       51.    Soon after, A. Ramirez  called his brother J. Ramirez who conspired

16  with A. Ramirez to make up lies about Chavira. After realizing what A. Ramirez

17  was trying to do, Chavira contacted Deputy Sheriff Kaplan once again at 4:32pm

18  to report what both were saying to her and their intentions of having her arrested.

19  Kaplan advised Chavira to go into the station and he would make a courtesy call to

20  City of Industry station and speak to the watch commander.  Chavira left the home

21  and requested to speak to the watch commander.

22       52.    Sgt. Westfall came out and spoke with Chavira who relayed all the

23  information, and he stated he had received the call.  He indicated that Chavira was

24  not going to be arrested, and that no one was going to be arrested for that matter

25  because there was no crime committed from what he was made aware.

26  Chavira gave him all the details and he advised her to go to court and file for a

27  restraining order immediately first thing tomorrow  but Westfall refused to seek

28

1 an EPO for Chavira nor did he advise her how to make a citizen's arrest of A.
2 Ramirez.

3    53.    Chavira asked for an escort to the home to retrieve belongings for her
4 kids and herself.  Deputy Arcos took the call and said she would be doing the
5 escort along with Sgt Sepulveda. Chavira immediately told the watch commander,
6 Arcos is a friend of J. Ramirez and A. Ramirez, and Chavira was not comfortable
7 with her, because she would side with them.  Arcos assured Chavira and the watch
8 commander she and Sgt Sepulveda were professional and there to do their job.

9    54.    Dep. Arcos stated, "**You have 15 min. to retrieve what you can**".
10 Dep. Sepulveda and Arcos were present when Chavira took pictures of the clothes
11 conveniently back in the washer as A. Ramirez tried to act like he had not done
12 anything wrong.  Because A. Ramirez had falsely accused Chavira of flooding the
13 area around the washing machine, Chavira requested that Deputy Arcos examine
14 that area which she did.  Arcos looked behind the washer for any sign of water
15 running or flooding of some sort, and she also looked and felt the lower panels
16 (base boards) around the walls by the washer and did not see any signs of water
17 flood or any water leakage in the area.

18    55.    Chavira and the two daughters left with three suitcases and the
19 clothes on their back. They went to Hernandez's home  to find out why he never
20 came to help. Chavira arrived at their home after 6:30 pm having nowhere to go
21 with no money for a room, and her daughters had school the next day.  Hernandez
22 and his wife had been at a Dodgers game and apologized.  Tina Hernandez
23 consoled Chavira as Chavira told her what had happened.  Hernandez  contacted
24 A. Ramirez but did not arrest him and did not report him to a supervisor.

25    56.    On May 30, 2012, Chavira phoned Pico Rivera station approximately
26 8:29 am and spoke to Sgt. Gallegos for 24 min. Chavira let her know that she was
27 in a Hotel and that A. Ramirez refused to help her find a place to live.  She stated,
28

1 "I can't make him pay or help you move, if he refuses there isn't anything I
2 can do.  You need to stop being a victim and get a job and help yourself".

3     57.    Chavira was shocked . Gallegos was rude and it was all an act
4 between A. Ramirez and her. Chavira broke down crying. Chavira only had one
5 more night in the hotel left, which A. Ramirez complained about.

6     58.    The parties began litigation.  On Monday, May 21, 2012,  about 6pm
7 A. Ramirez was served in person, the "Response to the Temporary Restraining
8 Order" forms, which he filed after the Ex Parte hearing for "Restraining Order
9 request", on May 3, 2012.

10     59.    At this time both the girls were in his care per the custody/visitation
11 judgment.  The parties shared 50/50 joint legal and physical, established December
12 2010.

13     60.    On May 23, 2013, Chavira picked both girls up after Spanish class,
14 about 3:45pm.  C.R. immediately started to cry and said she was scared to call or
15 text because of what her dad put her through.  C. R. stated that after school they
16 went swimming, and then in the evening she heard a knock and someone at the
17 door handed her father something.  After her father reviewed papers he became
18 angry and he quickly asked C. R. into the bedroom and started waving a "stack of
19 papers".  C.R. stated that her father then started to raise his voice in a loud scary
20 way, saying, "You see these papers here, your mom is trying to get daddy arrested
21 and fired from work, you are not to talk to anyone, no cops, judges, no social
22 workers, no anyone who asks you about what happens in our house, do you
23 understand"?  He stated, "Do you want daddy to go to jail and lose his job?
24 Because if that happens no more house, no pool and all of your things will be gone
25 and your mom won't have any money either"

26     61.    C.R. asked her mother, whether that was true.  C.R. said she was
27 scared to talk to anyone because she did not want her father to go to jail.

28

62.     Between 6:30 or 7:00 pm, Chavira contacted City of Industry Station from her friend Priscilla Ortiz's house, to speak to the watch commander and advise her.  Chavira spoke to Sgt. Westfall.  After relaying all that happened and giving him her name and A. Ramirez's name, Chavira stated she wanted her daughter to be interviewed and take a statement to make a report.

63.     Sgt Westfall asked her if she wished to speak to Lt Chavez and Chavira said yes.  Chavira was on hold for about 15-20 minutes.  Westfall came back on and said, "He's [Chavez] in a meeting and can't talk to you right now, but he asked me to tell you not to bring your daughter in here, we cannot take a statement or report and you need to address this tomorrow morning with Captain James Thornton, A. Ramirez's captain at his Pico Rivera station and take it from there."

64.     Chavira became frustrated and confused and said to him, "You can't take a report, when this is a form of child abuse and it happened in Hacienda Heights, not Pico Rivera?"  He said once again, not to bring the child there since they could not take a report from a minor.

65.     Chavira cried feeling hopeless, because they could not help, and it appeared as if they were advised not to. Chavira received no other information or numbers to contact CPS or a hotline.  Her friend encouraged her not to give up.

66.     On May 24, 2013, about 8:40am, Chavira requested to meet with Captain Thornton.  He came out and showed her into his office and Chavira met Lt. Curtis Jensen who would be taking her report. Chavira began with what happened on May 21, 2012,  and the recent incident with Gallegos and how she did not help.  Chavira started from the beginning of the domestic violence through the last incident.

67.     Chavira showed him all of the court documents and prior investigations in 2009, Temporary restraining orders, and all the text s with Hernandez, his wife Tina Hernandez, A. Ramirez's texts and other writings.

15

68.     Chavira stated she had proof of her allegations, including A. Ramirez putting the couple's intimate pictures and videos on a public website without her consent or knowledge, and that A. Ramirez had a secret account with several porn sites where he had posted explicit photos of her private parts.  Captain Thornton advised her to keep those records in a safe place and everything else Chavira had.

69.     Captain Thornton seemed in disbelief.  He acted quickly to start an immediate investigation and said he was going to contact DCFS and would send Chavira a text with the report numbers to address at court the next day, Friday May 25, 2012.   He acted very genuine, appearing to care for her and her children's safety and their well-being.  He apologized about how one of his own at his station has treated them  and that "He absolutely has zero tolerance for any form of domestic abuse".

70.     He shared that he was a child of a father who abused his mother up until he was 12 years of age, when his mother took action, put him in jail, and left him.  He gave Chavira his condolences about her mother's passing, because he knew that pain, his mother passed over a year ago.  Lt. Jensen took all her hard copies and made copies for his files.  As they both walked her out, both Captain and Lt. handed her $100.00 for her and her daughters.

71.     Later that night, at 10:55pm  Chavira received a text from Captain Thornton, as he said he would, indicating that he had initiated a crime investigation for domestic violence abuse with the report number, that the Department of Special Victims Bureau was investigating Penal codes, suspicious circumstances for attempting to dissuade a minor as a witness and emotional abuse to a minor, along with DCFS open case number, to give the court.

72.     A juvenile court proceeding was opening in Los Angeles County and then transferred to Orange County.  On April 25, 2013, the Orange County juvenile court judge order A. Ramirez again to comply with the Los Angeles County juvenile court orders which was to enroll in and attend an anger

1  management program and a parenting program.  A. Ramirez refused to do so,

2  showing contempt for lawful orders despite the fact he is a "law enforcement"

3  officer.

4      73.    On November 18, 2013, the Orange County Juvenile Court Judge

5  issued an exit order (which is a final judgment) awarding Chavira sole legal and

6  physical custody.  The Court continued the stay-away order and monitored

7  visitation for A. Ramirez one time a week for three hours which has been in place

8  since June 2012 because A. Ramirez refused to enroll in and complete both an

9  anger management program and a parenting program.

## EQUITY

11     74.    Plaintiff has no plain, adequate, or complete remedy at law to redress

12 the wrongs described herein.  Plaintiff has been, and will continue to be,

13 irreparably injured by the conduct of the defendant unless the court grants her the

14 declaratory and injunctive relief which she seeks.

## EXHAUSTION OF ADMINISTRATIVE REMEDY

16     75.    Chavira filed a timely administrative government claim with the

17 County.  She has exhausted her administrative remedy.

## FIRST CAUSE OF ACTION

**42 U.S.C. SEC. 1983 - Fourteenth Amendment -Denial of Due Process**

**and Equal Protection - Applies to All Plaintiffs and All Defendants,**

**Except County**

22     76.    Plaintiff incorporates paragraphs 1 - 65 as if fully set out in this First

23 Cause of Action.

24     77.    The defendants, except for County, violated Plaintiffs' right to due

25 process and equal protection on the basis of their gender and status as victims of

26 domestic violence when they failed to (1) make a felony arrest of A. Ramirez for

27 domestic violence; (2) when Gallegos failed to conduct an investigation as to who

28 the aggressor was, as required by Pen. C. Sec.13701(b) ("...Peace officers shall

1  make reasonable efforts to identify the dominant aggressor in any incident. The
2  dominant aggressor is the person determined to be the most significant, rather than
3  the first, aggressor."), spoke with her colleague A. Ramirez first rather than the
4  victim, threatened Chavira with arrest and to place her children with DCFS should
5  Chavira insist on having A. Ramirez arrested, when she made the domestic
6  violence victim and her two young children homeless; when she misled Chavira
7  that she could be forced to leave because her name was not on the title, that she
8  had authority to make A Ramirez pay for anything, and engaged in sexual
9  stereotyping telling Chavira that life was not fair, that she needed to leave A.
10  Ramirez, she needed to get a job, and she needed to stop being a victim  (3) when
11  all the defendants failed to notify Chavira that she could make a citizen's arrest
12  and how to do it safely in accordance with Pen. C. Sec. 836(a)(2);  (4). When they
13  failed to request an emergency TRO for Chavira and her children in accordance
14  with Fam. C. Secs 6250 - 6257.  (5) and when they failed to notify Chavira that
15  she was entitled to a copy of the D.V. incident report face sheet and the report
16  itself in accordance with Fam. C. Sec. 6228(a).

17        78.    The defendants, except for County, did not just ignore their
18  mandatory duties set out in California statutes concerning domestic violence
19  incidents and victims, they actively engaged in a concerted action to protect A.
20  Ramirez, and A. and J. Ramirez worked with the other defendants to insure that A.
21  Ramirez would not be arrested for domestic violence and drunk driving because he
22  was a fellow deputy which resulted in depriving the plaintiff and her two
23  daughters of equal protection and due process in accordance with the well
24  publicized pattern,  practice, and custom of the County Sheriff's Department to
25  cover up crimes committed by their fellow deputies and commanders.

26        79.    The conduct of the defendants is consistent with the findings of the
27  InterAmerican Human Rights Commission of the Organization of American States
28  in Report No. 80/11, Case 12.626, Merits, Jessica Lenahan (Gonzales) et Al.

United States, July 21, 2011:

94. Studies and investigations presented by the parties reveal that women constitute the majority of domestic violence victims in the United States.[fn 5 omitted.]....

P.30
110. Gender-based violence is one of the most extreme and pervasive forms of discrimination, severely impairing and nullifying the enforcement of women's rights. [fn 77 omitted.] **The inter-American system as well has consistently highlighted the strong connection between the problems of discrimination and violence against women.**[fn 78 omitted.] emphasis added.

80. See also Gonzales ruling at p. 26, para 96:

The Commission has also received information in the context of this case indicating that the problem of domestic violence in the United States was considered a "private matter," and therefore, undeserving of protection measures by law enforcement agencies and the justice system. Once domestic violence was finally recognized as a crime, women were still very unlikely to gain protection in the United States because of law enforcement's widespread under-enforcement of domestic violence laws. Very often, the police responded to domestic violence calls either by not taking any action, by purposefully delaying their response in the hope of avoiding confrontation, or, by merely attempting to mediate the situation and separate the parties so they could "cool off". [fn 58 omitted.]

See also p..27, para 97:

....However, one of the most serious historical limitations of civil restraining orders has been their widespread lack of enforcement by the police. Police officers still tend to support "traditional patriarchal gender roles, making it difficult for them to identify with and help female victims."

81. What the IAHRC found lacking with respect to the Castle Rock police in the Gonzales applies with equal force here (p.42, para 155):

Fifth, the lack of training of the Castle Rock police officers throughout the evening of June 22nd and the morning of June 23rd was evident. The response of the Castle Rock police officers, when assessed as a whole throughout this time period, displays misunderstandings and misinformation regarding the problem of domestic violence.

82. In addition, IAHRC found that the police failed to make the connection between domestic violence (against the mother who was the reporter) and child abuse: (p. 44, at para 165)

....In this case, the police appear to have assumed that Jessica

1  Lenahan's daughters and their friend would be safe with Simon
Gonzales because he was Leslie, Katheryn and Rebecca's father.
2  There is broad international recognition of the connection between
domestic violence and fatal violence against children perpetrated by
3  parents, and the CRPD officers should have been trained regarding
this link.[fn 263 omitted.]  The police officers should also have been
4  aware that the children were at an increased risk of violence due to
the separation of their parents, Simon Gonzales' efforts to maintain
5  contact with Jessica Lenahan, and his criminal background.

6      83.   Chavira and her daughters have  suffered extreme pain and suffering

7  mental anguish, emotional and physical distress, and have been injured in mind,

8  body, and spirit.   Chavira has had to retain an attorney to prosecute the rights of

9  her and her children.

10      84.   The acts of Defendants except County were willful, wanton,

11  malicious and oppressive, thus justifying an award of exemplary and punitive

12  damages against all the defendants in an amount to be determined at trial.

13  ## SECOND CAUSE OF ACTION

14  *Monell* **violation - applies to all plaintiffs and to County only**

15      85.   Plaintiff incorporates paragraphs 1 - 65, 75-82  into this Second

16  Cause of Action as if fully set out.

17      86.   Based on the principles set forth in *Monell v. Dept. Of Social*

18  *Services*, and related cases, County is liable for the injuries and damages suffered

19  by Mother and Children, because County maintains a policy, practice, custom, and

20  habit whereby sheriff personnel are improperly trained with respect to domestic

21  violence victims seeking EPO's and fail repeatedly to provide all the rights

22  domestic violence victims are entitled to based on the victims' female gender.

23      87.   Gallegos demonstrates the sexual stereotypes which still operate

24  when sheriff deputies are called out on domestic violence calls, such as evicting

25  the female victim and telling her in so many words "to get a life" although the

26  victim needs financial and emotional support when leaving a batterer on whom she

27  has depended financially.

28      88.   Specifically, the defendants, except A. Ramirez, failed to carry out

1  their mandatory duties with respect to Chavira and her daughters as set out in Pen.

2  C. Sec. 836(a)(2), Pen. C. Sec. 836(b), Pen. C. Sec. 13701(b) and ©, Fam. C. Secs

3  6250 - 6257, and Fam. C. Sec. 6228(a).

4        89.    On information and belief, the County Sheriff Department has failed

5  to enact policies concerning domestic violence in accordance with Pen. C. Sec.

6  13701( a) which states in part:

7      (a)    **Every law enforcement agency in this state shall develop, adopt,
   and implement written policies and standards for officers'
8  responses to domestic violence calls by January 1, 1986.** These
   policies shall reflect that domestic violence is alleged criminal
9  conduct. Further, they shall reflect existing policy that a request for
   assistance in a situation involving domestic violence is the same as
10  any other request for assistance where violence has occurred.
   Emphasis added.

11

12        90.    Gallegos' and the other defendants' conduct alleged in this complaint

13  prove that either the written policies were not enacted or alternatively, the County

14  failed to train them in those policies or alternatively, given the corrupt, brutal, and

15  violent culture of deputies who work in the jail, it was made clear to Gallegos that

16  the policies and training were not to be taken seriously:

17      (b)    The written policies shall encourage the arrest of an offender, absent
   exigent circumstances, if there is probable cause that a protective
18  order ...has been violated. These policies shall discourage, when
   appropriate, but not prohibit, dual arrests. Peace officers shall make
19  reasonable efforts to identify the dominant aggressor in any incident.
   The dominant aggressor is the person determined to be the most
20  significant, rather than the first, aggressor. In identifying the
   dominant aggressor, an officer shall consider the intent of the law to
21  protect victims of domestic violence from continuing abuse, the
   threats creating fear of physical injury, the history of domestic
22  violence between the persons involved, and whether either person
   acted in self-defense. These arrest policies shall be developed,
23  adopted, and implemented by July 1, 1996.

24        91.    For certain Sheriff Baca failed to train the deputies and other

25  department employees who are required to enforce the policies concerning

26  domestic violence calls and victims because none of the information described in

27  Pen. C. Sec.13701( c) was passed on to Chavira by the defendants such as, for

28  example:

(9)   Furnishing written notice to victims at the scene, including, but not limited to, all of the following information:

(A)   A statement informing the victim that despite official restraint of the person alleged to have committed domestic violence, the restrained person may be released at any time.

(B)   A statement that, "For further information about a shelter you may contact _____."

©   A statement that, "For information about other services in the community, where available, you may contact _____."

(D)   A statement that, "For information about the California victims' compensation program, you may contact 1-800-777-9229."

(E)   A statement informing the victim of domestic violence that he or she may ask the district attorney to file a criminal complaint.

(F)   A statement informing the victim of the right to go to the superior court and file a petition requesting any of the following orders for relief:

(I)   An order restraining the attacker from abusing the victim and other family members.

(ii)   An order directing the attacker to leave the household.

(iii)   An order preventing the attacker from entering the residence, school, business, or place of employment of the victim.

(iv)   An order awarding the victim or the other parent custody of or visitation with a minor child or children.

(v)   An order restraining the attacker from molesting or interfering with minor children in the custody of the victim.

(vi)   An order directing the party not granted custody to pay support of minor children, if that party has a legal obligation to do so.

(vii)   An order directing the defendant to make specified debit payments coming due while the order is in effect.

(viii)   An order directing that either or both parties participate in counseling.

(G)   A statement informing the victim of the right to file a civil suit for losses suffered as a result of the abuse, including medical expenses, loss of earnings, and other expenses for injuries sustained and damage to property, and any other related expenses incurred by the victim or any agency that shelters the victim ...

92.   As further evidence of the failure to train and to impress on the deputies that domestic violence is a serious crime, Chavira just happened to contact a supervisor sheriff who took domestic violence seriously and followed what should be the policy of the department if in fact there is a policy in place in accordance with Pen. C. Sec.13701.   However, it was hit and miss, mostly miss. All the defendants intended to hide, cover up, and trivialize the domestic violence of A. Ramirez because of the informal code of conduct which exists in the department, namely, refusing to report fellow officers' criminal conduct and refusing to arrest them when they commit crimes, like domestic violence or beating and abuse of jail inmates.

93.   As a result of the Sheriff's deliberate indifference to the rights of domestic violence victims and of the widespread culture of brutality, misogyny, and coverup of fellow deputies' criminal misconduct, Plaintiffs were denied due process and equal protection as females and victims of domestic violence as a result of the above-described pattern and practice;  and the above-described pattern and practice and culture of the Sheriff's department is the "moving force behind the constitutional violation."

94.   Chavira and her daughters have  suffered extreme pain and suffering mental anguish, emotional and physical distress, and have been injured in mind, body, and spirit.   Chavira has had to retain an attorney to prosecute the rights of her and her children.

## THIRD CAUSE OF ACTION

### Failure to Carry Out Mandatory Duty (Negligence per se) - Applies to all Plaintiffs and to All Defendants.

95.   Plaintiff incorporates paragraphs 1 - 64, 75-79, 82-85  into this Third

1  Cause of Action as if fully set out.

2       96.    The defendants failed to carry out their mandatory duties spelled out

3  in various statutes. Specifically, the defendants failed to carry out their mandatory

4  duties with respect to Chavira and her daughters as set out in Pen. C. Sec.

5  836(a)(2), Pen. C. Sec. 836(b), Pen. C. Sec. 13701(b) and ©, Fam. C. Secs 6250 -

6  6257, and  Fam. C. Sec. 6228(a).  They did so in violation of Plaintiffs' equal

7  protection rights as females and status as victims of domestic violence.

8       97.    The County is liable under the doctrine of *respondeat superior.*

9       98.    Chavira and her daughters have  suffered extreme pain and suffering

10  mental anguish, emotional and physical distress, and have been injured in mind,

11  body, and spirit.   Chavira has had to retain an attorney to prosecute the rights of

12  her and her children.

13       99.    The acts of Defendants **except County** were willful, wanton,

14  malicious and oppressive, thus justifying an award of exemplary and punitive

15  damages against all the defendants in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION

### Gender Violence, California Civil Code Sec. 52.4, Applies to Plaintiff Chavira and to Defendant A. Ramirez

19       100.   Plaintiff incorporates paragraphs 1 - 65 into this Fourth Cause of

20  Action as if fully set out.

21       101.   When A. Ramirez committed the acts of domestic violence against

22  Plaintiff as described in paragraphs 17-41, *supra,* convinced Gallegos to evict

23  Chavira and their two young daughters from the home, acted in concert with

24  fellow deputy sheriffs to avoid arrest and prosecution for domestic violence, A.

25  Ramirez committed gender violence against Plaintiff.

26       102.   That gender played a role is evidenced by the fact that he called her

27  names like "bitch" and "whore" and other gender-based labels.  It is further

28  evidenced by the fact that he violated Chavira's sexual privacy by posting photos

1  of her private parts on internet porn sites without her consent or knowledge.   A.
2  Ramirez may have beaten men working as a sheriff.  However, on information and
3  belief, he never called them"whores" as he beat them, nor did he post their private
4  parts on internet porn sites.

5       103.   As a proximate result of the gender violence inflicted on Plaintiff
6  Chavira by A. Ramirez, Plaintiff Chavira has suffered mental anguish, and severe
7  emotional and physical distress, and has been injured in mind, body, and spirit.
8  She has had to retain an attorney to prosecute this lawsuit.

9       104.   The acts of A. Ramirez were willful, wanton, malicious, and
10 oppressive, thus justifying an award of exemplary and punitive damages against A.
11 Ramirez in an amount to be determined at trial.

12      **FIFTH CAUSE OF ACTION**

13      **Domestic violence- Applies to All Three Plaintiffs and to A. Ramirez**

14      105.   Plaintiff incorporates paragraphs 1 - 65 into this Fifth Cause of
15 Action as if fully set out.

16      106.   When A. Ramirez committed the acts of domestic violence against
17 Plaintiff and their two daughters as described in paragraphs 17-41, 51, *supra,* A.
18 Ramirez committed domestic violence against Plaintiff and his two daughters.

19      107.   As a proximate result of the domestic violence inflicted on Plaintiff
20 Chavira and the two daughters by A. Ramirez, Plaintiff Chavira and the two
21 daughters have suffered mental anguish, and severe emotional and physical
22 distress, and has been injured in mind, body, and spirit.  Chavira has had to retain
23 an attorney to prosecute this lawsuit on behalf of herself and her two daughters.

24      108.   The acts of A. Ramirez were willful, wanton, malicious, and
25 oppressive, thus justifying an award of exemplary and punitive damages against A.
26 Ramirez in an amount to be determined at trial.

27      **SIXTH CAUSE OF ACTION**

28      **False Imprisonment - Applies to C.R. and to A. Ramirez**

25

109.   Plaintiff incorporates paras 1 - 65 into this Sixth Cause of Action as if fully set out.

110.   When A. Ramirez took C.R. into the bedroom to threaten and intimidate her as a witness in her mother's domestic violence proceeding, A. Ramirez falsely imprisoned C.R. because he did not allow her to leave when it was clear that she did not want to be in the bedroom having her father threaten and intimidate her.

111.   C. R. has  suffered extreme pain and suffering mental anguish, emotional and physical distress, and has been injured in mind, body, and spirit. Her mother has had to seek medical care for her and employ a psychologist to attend to her extreme emotional distress because of what her father did to her and to her mother in her presence.

112.   The acts of A. Ramirez was willful, wanton, malicious and oppressive, thus justifying an award of exemplary and punitive damages against A. Ramirez in an amount to be determined at trial.

## SEVENTH CAUSE OF ACTION

### Intentional Infliction of Emotional Distress -

### Applies to C.R. and to A. Ramirez

113.   Plaintiff incorporates paras 1 - 65 into this Sixth Cause of Action as if fully set out.

114.   When A. Ramirez took C.R. into the bedroom to threaten and intimidate her as a witness in her mother's domestic violence proceeding, he intentionally inflicted emotional distress on his young daughter because he knew or should have known that making the threats to such a small child who loved both her mother and father was severe and outrageous exceeding all possible bounds of decency, and is intolerable in a civilized community.  A. Ramirez  did not allow C.R. to leave when it was clear that she did not want to be in the bedroom having her father threaten and intimidate her.

115.   As a direct result of her father inflicting emotional distress on C.R., falsely imprisoning C. R. , and intimidating and threatening her concerning her testimony in her mother's domestic violence proceeding, C.R. has  suffered extreme pain and suffering mental anguish, emotional and physical distress, and has been injured in mind, body, and spirit.   Her mother has had to seek medical attention for her and to employ a psychologist to attend to her emotional and mental distress.

116.   The acts of A. Ramirez was willful, wanton, malicious and oppressive, thus justifying an award of exemplary and punitive damages against A. Ramirez in an amount to be determined at trial.

## EIGHTH CAUSE OF ACTION

### INJUNCTIVE RELIEF

117.   Plaintiffs incorporate paras 1 - 95 into this Eighth Cause of Action as if fully set out.

118.   Plaintiffs request that the Court enter a permanent mandatory injunction against the Sheriff Department ordering the department to

1)   Hold regular training sessions to explain the policies of the department and state laws concerning domestic violence

2)   Impress on all the personnel of the Sheriff's Department, including non-sworn personnel, such as dispatchers, and all sworn personnel the importance of enforcement of all domestic violence laws and department policies;

3)   Impose immediate disciplinary action against all personnel who engage in conduct showing a reckless disregard for the rights of domestic violence victims;

4)   Review periodically department policies and case law as it evolves concerning the rights of domestic violence victims;

5)   Place all sworn personnel against whom a CLETS domestic violence

order is imposed in positions where they are not allowed to carry weapons;

6) Punish all personnel who engage in cover up of domestic violence crimes committed by other personnel.

**PRAYER**

WHEREFORE, plaintiff prays for damages and attorney fees as to each cause of action against each defendant as permitted by law, as follows:

1. As to the First through Fifth Causes of Action, Plaintiff and her two daughters be awarded special and compensatory damages;

2. As to the Sixth and Seventh Causes of Action, C.R. be awarded special and compensatory damages;

2. As to the First through Seventh Causes of Action, except for the Second Cause of Action, Plaintiff and her two daughters or C. R. Alone be awarded punitive damages against the individual defendants, except County, named in those causes of action;

3. As to the First and Second Causes of Action Plaintiff and her two daughters be awarded attorney fees pursuant to 42 U.S.C. Sec.1988;

4. As to the Third and Eighth Causes of Action, Plaintiff and her two daughters be awarded attorney fees pursuant to Code of Civ Procedure Sec.1021.5;

5. As to the Fourth Cause of Action, Plaintiff be awarded attorney fees pursuant to Civil Code Sec.54.2(a);

6. As to the Eighth Cause of Action, the Court enter a mandatory injunction as alleged in the Eight Cause of Action

6. For such other relief as may be just and proper.

DATED: January 13, 2014

PATRICIA J. BARRY

28

1

**JURY REQUEST**

2

Plaintiff requests a jury trial on all issues triable to a jury.

3

DATED: January 13, 2014

4

5

PATRICIA J. BARRY

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28